LAW OFFICES OF STEPHEN M. MURPHY
STEPHEN M. MURPHY (No. 103768)
P. BOBBY SHUKLA (No. 229736)
180 Montgomery Street, Suite 940
San Francisco, CA 94104
Tel:    (415) 986-1338
Fax:    (415) 986-1231


Attorneys for Plaintiff
BETH A. RHODES, M.D.

## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA, SACRAMENTO DIVISION

| | |
|---|---|
| BETH A. RHODES, M.D., | NO. |
| Plaintiff, | **COMPLAINT FOR DAMAGES FOR RETALIATION IN VIOLATION OF UNITED STATES CODE § 3730(h); RETALIATION IN VIOLATION OF GOVERNMENT CODE § 12653(b); CONSTRUCTIVE DISCHARGE IN VIOLATION OF PUBLIC POLICY; GENDER HARASSMENT IN VIOLATION OF GOVERNMENT CODE §§ 12940(a) and (j); GENDER DISCRIMINATION IN VIOLATION OF GOVERNMENT CODE § 12940(a); RETALIATION IN VIOLATION OF GOVERNMENT CODE § 12940(h);FAILURE TO PREVENT DISCRIMINATION IN VIOLATION OF GOVERNMENT CODE §12940(k); DEFAMATION; AND INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS** |
| v. | |
| SUTTER HEALTH, a California Corporation, SUTTER GOULD MEDICAL FOUNDATION, a California Corporation, THE GOULD MEDICAL GROUP, INC., a California Corporation, | |
| Defendants. | |
| | **JURY TRIAL DEMANDED** |

Plaintiff BETH A. RHODES, M.D. alleges:

## PARTIES

1.    Plaintiff BETH A. RHODES, M.D., is an individual and at all relevant times mentioned herein was employed in the State of California.

2.    Plaintiff is informed and believes and on that basis alleges that defendant SUTTER HEALTH ("Sutter Health") is and at all times relevant hereto was a corporation doing business throughout the State of California and Pacific Region with its principal place of business based upon its registration with the California Secretary of State in the City of Sacramento, County of Sacramento, State of California. Upon information and belief, plaintiff alleges that Sutter Health was her joint employer under the "integrated enterprise" theory.

3.    Plaintiff is informed and believes and on that basis alleges that defendant SUTTER GOULD MEDICAL FOUNDATION ("Foundation") is and at all times relevant hereto was a corporation doing business in the State of California with its principal place of business based upon its registration with the California Secretary of State in the City of Modesto, County of Stanislaus, State of California.

4.    Plaintiff is informed and believes and on that basis alleges that defendant THE GOULD MEDICAL GROUP, INC. ("Group") is and at all times relevant hereto was a corporation doing business in the State of California with its principal place of business based upon its registration with the California Secretary of State in the City of Modesto, County of Stanislaus, State of California.

5.    Plaintiff is informed and believes, and thereon alleges, that each of the defendants herein was, and at all times relevant to this action, the agent, employee,

2

COMPLAINT FOR DAMAGES

representing partner, or joint venturer of the remaining defendants and was acting within the course and scope of that relationship. Plaintiff is further informed and believes, and thereon alleges, that each of the defendants herein gave consent to, ratified, and authorized the acts alleged herein to each of the remaining defendants.

## JURISDICTION AND VENUE

6.    This action arises under the laws of the United States, 31 U.S.C. § 3729 *et seq.*, also known as the Federal False Claims Act. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 31 U.S.C. § 3732. Pursuant to 28 U.S.C. 1367, this court also has pendent jurisdiction over the state law claims brought herein.

7.    This Court has personal jurisdiction over defendants because each defendant has substantial contacts and transacts business in the State of California and in this judicial district.

8.    Venue is proper in this Court pursuant to 28 U.S.C. §§ 1391(b) and1391(c) and local rule 120(d) because a substantial part of the events giving rise to plaintiff's claims occurred in the Eastern District of California, including the San Joaquin county and because defendants are subject to personal jurisdiction in the Eastern District of California. Venue is also proper in this Court pursuant to 31 U.S.C. § 3732 because defendants reside and transact business in the Eastern District of California and the acts proscribed by 31 U.S.C. § 3729 occurred in the Eastern District of California.

## FACTS COMMON TO ALL CAUSES OF ACTION

9.    Plaintiff was employed as a Board Certified Radiologist specializing in

COMPLAINT FOR DAMAGES

breast and body imaging by the defendant Gould Medical Group, Inc., from on or about January 28, 2008 until her constructive termination on or about May 27, 2011. From the time she was hired, Dr. Rhodes performed her job satisfactorily.

10.    Plaintiff worked at the defendant Sutter Gould Medical Foundation's facilities located in Modesto and Stockton. Gould Medical Group, Inc. is affiliated with Sutter Gould Medical Foundation and Sutter Health. The Foundation runs the business side of the Gould Medical Group and the Group appoints three members to the Foundation boards, and staffs quality assurance, finance and other committees along with administrative members. The Foundation is part of Sutter Health.

11.    In the summer of 2008, Dr. Rhodes orally advised the senior partners that the Group's "protocol" requiring pre-biopsy surgical consultations was medically unnecessary, delayed proper patient care and was essentially self-referral to the Group, Foundation and Sutter Health for monetary gain and amounted to Medicare fraud. Dr. Rhodes reported the issue to fulfil her obligation as a medical doctor to the public by advocating for medically appropriate health care consistent with the public policy of the state as set forth by the legislature. She was also concerned that the practice was defrauding her patients as well as the federal and state government through improper Medicare and Medi-Cal claims.

12.    Defendants told Dr. Rhodes that it was the Group's policy and she had to follow it. However, she was not provided with any medically or ethically justifiable reason for the protocol. To the displeasure of the Group's key administrators, she noted in her chart reviews, where biopsy was indicated, that she was following

COMPLAINT FOR DAMAGES

department policy by making the pre-biopsy patient referrals.

13.    Dr. Paul Stadelman, the Gould Medical Group's Chief Partner, with the support of Dr. Steven Mitnick, the Medical Director of the Gould Medical Group, punished Dr. Rhodes for advocating for patient care over corporate profits by deliberately assigning her low RVU work. RVU stands for Relative Value Unit. Low-RVU assignments are time-intensive assignments which are less desirable and regarded with less prestige. When she was hired, Dr. Stadelman told Dr. Rhodes that she would be given more high RVU work once other radiologists were hired.  Although the Group hired more radiologists in September 2009, Dr. Stadelman continued to assign low RVU work to Dr. Rhodes. In order to keep her RVUs up, Dr. Rhodes was forced to stay at work until late in the evening, after other radiologists had gone home, to read other modalities, such as CT, MRI and plain films. By giving her almost exclusively low-RVU assignments, Drs. Stadelman and Mitnick made it appear as though plaintiff had developed time management issues. Dr. Stadelman also unfairly cited Dr. Rhodes for "time management" issues in a May 2009 performance evaluation.

14.    Dr. Rhodes witnessed and documented several instances of care being delivered to patients by Group members and technicians that was below the standard of care. Pursuant to her obligation to advocate for medically appropriate health care, she brought these instances to the attention of the senior staff at the Group.

15.    Among the complaints of sub-standard care Dr. Rhodes reported are the following:

5

COMPLAINT FOR DAMAGES

- There was a continued lack of correlation between mammographic and sonographic findings subsequent to ultrasound-guided breast biopsies as a particular radiologist performing the biopsy was not qualified to read mammograms. This was in clear violation of the American College of Radiology Guidelines for Breast Ultrasound Biopsies which requires that the physician performing the breast interventional procedure be familiar with breast ultrasound anatomy and must be capable of correlating the results of mammographic and other examinations and procedures and the biopsy pathology with the sonographic findings. This was very dangerous for the patient and has almost resulted in the premature demise of a young patient.

- Dr. Rhodes protested several times to Roberta Edge, the Director of Imaging Services, and the partners that a certain ultrasound technologist should not be scanning the breast due to incompetency. Not only did they continue to permit this technologist to scan the breast, but she was even sent to Stockton without supervision to scan the breast. She missed a very obvious cancer on a scan and was finally taken off breast ultrasound one and a half years later.

- A radiologist was unable to distinguish suspicious from non-suspicious breast lesions, recommending too many biopsies on non-suspicious lesions and not enough on suspicious lesions. This resulted in a cancer detection rate of 1%, far below the national average (20-25%).

- Dr. Rhodes repeatedly complained about the Group's protocol requiring a pre-biopsy surgical consultation as medically unnecessary, gouging of patients

6
COMPLAINT FOR DAMAGES

and insurers and constituting Medicare fraud.

• A radiologist requested eight unnecessary mammographic views on an 18 year old patient with a family history of breast cancer, thereby increasing her lifetime risk of breast cancer. Dr. Rhodes repeatedly complained about the Group performing mammograms on very young women.

• A radiologist performed a breast ultrasound vacuum-assisted biopsy behind the nipple of a 13 year old child and a post-biopsy mammogram. The biopsy yielded benign breast tissue with scattered ducts. This likely resulted in irreversible damage to the breast bud retarding/preventing the growth of the breast.

• Dr. Rhodes repeatedly complained about the Group's hiring radiologists without proper training or experience to do breast imaging.

16.    As to some of these complaints, plaintiff was simply ignored; as to others, like the pre-biopsy surgical self-referral protocol, she was told directly by Dr. Stadelman if she did not keep quiet she would not be made a shareholder in January of 2010.

17.    On October 27, 2009, Dr. Rhodes received a notice from the senior partners that stated: "Effective January 1, 2010: When scheduled to work or be on call, you will be required to be living in the vicinity. There will be no more long distance commuting for shareholders or associates. All PACS units purchased through GMG will need to be in the vicinity as well. If you have a second residence farther away than Stockton, and wish a home unit, you will need to purchase that on your own."

18.    This ad hoc rule was applied to fire two female radiologists, who refused

7

COMPLAINT FOR DAMAGES

to purchase homes in Modesto-Stockton, but was not applied to male members who lived in Dublin, San Ramon, Los Angeles or Santa Fe, New Mexico. This was typical of the preference given to male members of the Group to the detriment of the female members of the Group.

19.    Throughout 2009 Dr. Rhodes continued to try and balance patient safety and her own ethical and professional code while her complaints were being ignored.

20.    On January 21, 2010, Dr. Rhodes received a letter from Martin F. Pricco, M.D., President of the Gould Medical Group advising her of her election to shareholder status with the Group.

21.    Dr. Rhodes continued to bring up patient care issues with Dr. Stadelman and other Group members in the first quarter of 2010, including a serious concern about a radiologist in the Group who did not have sub-specialty training in radiology as borne out by her positive ultrasound biopsy rate of only 1% compared to a national average of 20-25%. Dr. Rhodes is informed and believes that the radiologist was allowed to practice without the necessary training because of her special relationship with another group member.

22.    On April 30, 2010, at a meeting with Dr. Rhodes, Dr. Stadelman and Director of Imaging Services Ms. Edge, the radiologist about whom Dr. Rhodes had raised concerns loudly and aggressively accused Dr. Rhodes of "talking behind her back." Dr. Rhodes responded calmly and asked the radiologist to lower her voice. Dr. Stadelman then asked Dr. Rhodes questions about her concerns about the radiologist's interpretations and patient care to which she responded honestly and

8
COMPLAINT FOR DAMAGES

fairly. The meeting ended cordially. At his request, the next day Dr. Rhodes provided an email to Dr. Stadelman with information about other employees who had voiced their concern about the radiologist's treatment of technologists. Dr. Stadelman had indicated that he would ensure an unbiased investigation would take place.

23.    On June 1, 2010, Dr. Rhodes and her husband, Dr. Giacomo Ruosi, had dinner with Dr. Martin Pricco, the Group's president. Dr. Rhodes shared her concerns with him regarding defendants' medically inappropriate patient care and the fact that the senior partners make all of the decisions and would not consider the concerns raised by others.  Dr. Pricco seemed receptive, acknowledged that the radiology department had always had problems and acknowledged that Dr. Rhodes' patient care issues were valid and needed addressing. Therefore, on June 8, 2010 Dr. Rhodes requested a meeting with Dr. Mitnick and Dr. Stadelman. Instead of scheduling the meeting, Dr. Mitnick instructed Dr. Stadelman to speak with her together with Director of Imaging, Ms. Edge, on June 10, 2010.

24.    On June 10, 2010, Dr. Pricco sent an email to Dr. Rhodes and her husband stating that  Drs. Stadelman and Mitnick perceived her as being rude, to lie low and if she had a problem to put it in writing to Dr. Stadelman and Ms. Edge.

25.    Later that afternoon, Dr. Rhodes received a letter signed by Dr. Stadelman falsely accusing her of improper conduct. Attached was a copy of the Group Compact. The letter threatened Dr. Rhodes as follows: "Any further unprofessional behavior as was witnessed in your interaction with a staff member late last year and on 4/30/10 with myself, and Robbie Edge will be grounds for your

COMPLAINT FOR DAMAGES

immediate termination."

26.    The letter caused Dr. Rhodes's extreme stress and anxiety. She began to have physical problems, such as difficulty controlling her blood pressure, headaches and trembling.

27.    Brian Wistow, M.D., another long time Group shareholder, told Dr. Rhodes' husband that she should not say anything about the letter by Dr. Stadelman or respond to it or else her life at the Group would get worse for her.

28.    Dr. Rhodes's working environment progressively worsened. Ms. Edge began a campaign of harassment and hostile work environment against Dr. Rhodes. Without regard to patient safety, plaintiff is informed and believes that Ms. Edge used employees who were loyal to her to create disturbances, including intentionally mis-setting diagnostic settings during tests of Dr. Rhodes's patients in order to force Dr. Rhodes to lose her temper. In June 2010, defendants also threatened plaintiff with termination based on false accusations of "unprofessional behavior" and warned her that should she engage in "unprofessional behavior" again it would be grounds for immediate termination. In July 2010, defendants also gave plaintiff a Physician Review Summary which contained false and unjustified criticism and also gave her a falsely negative annual evaluation for 2010 which resulted in the denial of a $10,000 performance bonus.

29.    Sutter Health employee Kathy Davis RN falsely told a patient that Dr. Rhodes did not care about what she was doing during a biopsy which was why the patient developed a hematoma. Ms. Davis also falsely stated to a radiologist that Dr.

Rhodes "has the worst hematomas." In an effort to make it appear as though Dr. Rhodes caused a patient pain during a biopsy, Ms. Davis also deliberately changed the patient's rating relating to pain.

30.    In or around September 2010, Ms. Edge, Ms. Davis and partner Dr. Knox told defendants' employees that Dr. Rhodes was a "bad element" that was going to get the Group sued and that she should be eliminated. Dr. Stadelman and Dr. Triolo also told members that plaintiff did not follow protocols and Dr. Stadelman accused her of "bad behavior" at a monthly meeting for radiologists. Plaintiff also learned that at the beginning of October 2010, Ms. Edge told defendants' employees that Dr. Rhodes will be under investigation for the month of October. At the time, defendants were supposed to be conducting an investigation of Dr. Rhodes' complaints. She was never told she was under investigation. In December 2010, plaintiff also learned that partners of the Group told members that they had a "big file" on plaintiff and that she was on "thin ice" because of her conduct. In addition, Dr. Mitnick told members that plaintiff was rude to colleagues and staff. In February 2011, Dr. Summers told plaintiff that Dr. Stadelman told him that he had a "very big file" on plaintiff and that she was going to be fired.

31.    During this time, Dr. Stadelman continued to assign Dr. Rhodes low-RVU work. On July 26, 2010, Dr. Stadelman wrote his third Physician Review Summary which falsely and unfairly criticized Dr. Rhodes's performance. She refuted his comments in writing.

32.    As the campaign of harassment and hostile work environment continued,

Dr. Rhodes emailed Drs. Stadelman and Mitnick on September 15, 2010, reminding them that she had taken the job because they had promised her that she would be allowed to do a significant amount of breast biopsies (high RVU work). Instead, to the detriment of her professional career, she was being relegated to an inordinate amount of breast ultrasound work (low RVU).

33.    The next day, September 16, 2010, in response to the above email and her complaints of improper patient care and harassment, Dr. Stadelman became so angry at Dr. Rhodes that he assaulted her by pointing his finger at her near her eye while screaming at her. He came at her in an aggressive manner, causing her to move backwards from the radiology screening mammography room, and told her she deserved to be treated badly. Dr. Rhodes fled in tears to the Urgent Care department to seek comfort from her husband, who then emailed Dr. Mitnick, who then came to the radiology department where he witnessed Dr. Rhodes in her distraught condition.

34.    When Dr. Stadelman gave Dr. Rhodes her annual evaluation for 2010, he stated that her low RVUs would affect her bonus. Despite her consistent requests for high RVU work, from the summer of 2010 on, Dr. Stadelman assigned Dr. Rhodes low RVU work almost exclusively. As a result of the evaluation, Dr. Rhodes was denied a $10,000 performance bonus.

35.    On September 17, 2010, due to her continued concern for patient safety, Dr. Rhodes contacted the allegedly independent ombudsman service, Ethics Point, at defendant Sutter Health and provided them with her complaints of harassment, gender discrimination, Medicare fraud, time care fraud and inappropriate patient advocacy.

12
COMPLAINT FOR DAMAGES

36.    Thereafter, in late September, Dr. Rhodes learned that Dr. Mitnick, Dr. Stadelman, Dr. Melinda Knox and Ms. Edge had been asking a non-shareholder radiologist at the Group to provide a false report about her. They told the radiologist that it would be for the benefit of the group. The radiologist was a candidate for shareholder at the time.

37.    From that point forward, the hostile work environment that Dr. Rhodes was experiencing greatly worsened and she heard from others that she had a "big file," "was on thin ice" and "on the way out."

38.    On November 24, 2010, she wrote an email to the Group that set out in no uncertain terms that the "Surgical Consult Prior to Breast Needle Biopsy" protocol fraud had to stop as it constituted insurance billing fraud and Medicare and Medi-Cal billing fraud.

39.    The Sutter Health Compliance Officer responded in late November saying she did not understand what Dr. Rhodes' "problem" was with Sutter Gould's practice. Dr. Rhodes sent another email on December 7, 2010, setting forth her basis for the "problematic issue" and again advocating for medically appropriate health care for patients.

40.    On December 13, 2010, on her first day back from vacation, Dr. Mitnick hand-delivered a letter to Dr. Rhodes signed by him and Stephanie Miller, RN, the Director of Human Resources for the Foundation, that alleged that several complaints had been filed by Group employees against Dr. Rhodes during the period when she had been on vacation, which was after Dr. Rhodes had filed her own complaints. At the

COMPLAINT FOR DAMAGES

time, there had been no resolution of the complaints Dr. Rhodes filed on September 17, 2010 and November 24, 2010, nor did defendants appear to be investigating her complaints.

41.    On December 14, 2010, the next day, Dr. Rhodes worked a full day but was mentally and emotionally distraught due to defendants' actions.

42.    As a direct result of the actions of defendants set forth above, on December 16, 2010, Dr. Rhodes' treating physician at the Group medically excused Dr. Rhodes from work from December 16, 2010 through February 4, 2011 and extended it again through May 27, 2011.

43.    Around this time plaintiff was warned by various members of the Group that she would be terminated. Dr. Rhodes also learned that Dr. Stadelman had announced at a radiology meeting that Dr. Rhodes would be terminated. In February 2011, radiologist Dr. Brad Summers told Dr. Rhodes that Dr. Stadelman told him that he had a "very big file" on Dr. Rhodes. Dr. Summers also told Dr. Rhodes that at a compensation committee meeting senior partners said that Dr. Rhodes will be terminated and that he had heard the same from the senior partners on several occasions. In January 2011, Dr. Rhodes's name was removed from the list of recipients for department announcements, which meant she was no longer receiving invitations to important department meetings.

44.    On May 27, 2011, Dr. Rhodes resigned her position at the Group due to intolerable and hostile working conditions which caused her physical and emotional distress. Plaintiff is informed and believes and thereon alleges that Sutter Health, the

14
COMPLAINT FOR DAMAGES

Foundation and the Group to date have not changed their protocols or practices which fail to provide medically appropriate health care for their patients. Dr. Rhodes was faced with a choice between receiving a very lucrative salary as a shareholder in exchange for acquiescing in the Group's illegal conduct of fraudulent billing practices and provision of sub-standard patient care. She chose her patients.

45.   Plaintiff is informed and believes and thereon alleges that prior to the actions perpetrated against Dr. Rhodes, other Group and Foundation employees have been subjected to similar campaigns of harassment and retaliation and been subjected to similar intentionally fabricated "wrongdoing" by defendants' agents and employees identified above with the intentional result of causing the same serious personal health consequences as were suffered by Dr. Rhodes or in the alternative to quit and allow the illegal and unethical practices to continue.

### FIRST CAUSE OF ACTION
**(Retaliation in Violation of 31 U.S.C. § 3730(h))**

46.   The allegations of paragraphs 1 through 45 are realleged and incorporated herein by reference.

47.   At all times herein mentioned, United States Code, Title 31, § 3730(h), was in full force and effect and was binding on defendants and prohibited defendants from discharging, threatening, harassing or any other form of discrimination against an individual like plaintiff who engaged in lawful acts in furtherance of a false claims action and engaged in other efforts to stop one or more violations under United States Code, Title 31, § 3730(h) by her protests of fraudulent billing practices by defendants which included Medicare fraud.

48.   Defendants violated the foregoing statute by constructively discharging, threatening, harassing, and discriminating against plaintiff due to her protected activities.

49.   As a proximate result of defendants' conduct, plaintiff is entitled to reinstatement with the same seniority status that she would have had but for the discrimination pursuant to United States Code, Title 31, § 3730(h)(2) and is also entitled to an award of damages resulting from these actions by defendants.

50.   As a proximate result of defendants' conduct, plaintiff has sustained and continues to sustain losses in earnings and other employment benefits which justifies an award of double damages for back pay plus interest pursuant to United States Code, Title 31, § 3730(h)(2).

51.   As a proximate result of defendants' conduct, plaintiff has suffered and continues to suffer humiliation, emotional distress, and mental anguish, all to her damage in a sum according to proof. Plaintiff has sought treatment for the emotional distress and mental anguish she has suffered due to defendants' conduct and is entitled to special damages for the costs of such treatment pursuant to United States Code, Title 31,  § 3730(h)(2).

52.   Defendants committed the acts alleged herein maliciously, fraudulently, and oppressively, with the wrongful intention of injuring plaintiff, and acted with an improper and evil motive amounting to malice and in conscious disregard of plaintiff's rights. Because the acts taken toward plaintiff were carried out by defendants acting in a despicable, deliberate, cold, callous, and intentional manner in order to injure and

damage plaintiff, she is entitled to recover punitive damages in an amount according to proof.

53.     Plaintiff has incurred and continues to incur legal expenses and attorneys fees. Pursuant to United States Code, Title 31, § 3730(h)(2), plaintiff is entitled to the litigation costs and reasonable attorneys' fees she has incurred in pursuit of this action. Plaintiff is presently unaware of the precise amount of said expenses and fees and prays leave of court to amend this complaint when said amounts are more fully known.

## SECOND CAUSE OF ACTION
### (Retaliation in Violation of Government Code § 12653(b))

54.     The allegations of paragraphs 1 through 53 are realleged and incorporated herein by reference.

55.     At all times herein mentioned, California Government Code section § 12653(b), was in full force and effect and was binding on defendants and prohibited defendants from discharging, threatening, harassing or any other form of discrimination against an individual like plaintiff who engaged in lawful acts on behalf of others in furthering a false claims action by her protests of fraudulent billing practices by defendants which included Medicare fraud.

56.     Defendants violated the foregoing statute by constructively discharging, threatening, harassing, and discriminating against plaintiff due to her protected activities.

57.     As a proximate result of defendants' conduct, plaintiff has sustained and continues to sustain losses in earnings and other employment benefits which justifies an award of double damages for back pay plus interest pursuant to Government Code

§ 12653 (c).

58.    As a proximate result of defendants' conduct, plaintiff has suffered and continues to suffer humiliation, emotional distress, and mental anguish, all to her damage in a sum according to proof. Plaintiff has sought treatment for the emotional distress and mental anguish she has suffered due to defendants' conduct and is entitled to special damages for the costs of such treatment pursuant to Government Code § 12653 (c).

59.    Defendants committed the acts alleged herein maliciously, fraudulently, and oppressively, with the wrongful intention of injuring plaintiff, and acted with an improper and evil motive amounting to malice and in conscious disregard of plaintiff's rights. Because the acts taken toward plaintiff were carried out by defendants acting in a despicable, deliberate, cold, callous, and intentional manner in order to injure and damage plaintiff, she is entitled to recover punitive damages in an amount according to proof and pursuant to Government Code § 12653 (c).

60.    Plaintiff has incurred and continues to incur legal expenses and attorneys fees. Pursuant to Government Code § 12653 (c), plaintiff is entitled to the litigation costs and reasonable attorneys' fees she has incurred in pursuit of this action. Plaintiff is presently unaware of the precise amount of said expenses and fees and prays leave of court to amend this complaint when said amounts are more fully known.

## THIRD CAUSE OF ACTION
### (Constructive Discharge in Violation of Public Policy)

61.    The allegations set forth in Paragraphs 1 through 60 are re-alleged and incorporated herein by reference.

COMPLAINT FOR DAMAGES

62.     At all times herein mentioned, Business and Professions Code §2056 provided in pertinent part as follows: "(b) It is the public policy of the State of California that a physician and surgeon be encouraged to advocate for medically appropriate health care for his or her patients. For purposes of this section, "to advocate for medically appropriate health care" means .... (or) to protest a decision, policy, or practice that the physician, consistent with that degree of learning and skill ordinarily possessed by reputable physicians practicing according to the applicable legal standard of care, reasonably believes impairs the physician's ability to provide medically appropriate health care to his or her patients. (c) The application and rendering by any person of a decision to terminate an employment or other contractual relationship with, or otherwise penalize, a physician and surgeon principally for advocating for medically appropriate health care consistent with that degree of learning and skill ordinarily possessed by reputable physicians practicing according to the applicable legal standard of care violates the public policy of this state. No person shall terminate, retaliate against, or otherwise penalize a physician and surgeon for that advocacy, nor shall any person prohibit, restrict, or in any way discourage a physician and surgeon from communicating to a patient information in furtherance of medically appropriate health care. ..." Defendants also caused the wrongful constructive termination of Dr. Rhodes for asserting her rights as set forth in Government Code Section 12940, et seq. which prohibits gender discrimination, harassment and retaliation; the California Constitution, Article 1, Section 8 which prohibits gender discrimination; and other statutes and regulations governing the employment relationship. Defendants also caused the wrongful constructive termination of Dr. Rhodes because she engaged in lawful acts in furtherance of a false claims action and engaged in other efforts to stop one or more violations under United States Code, Title

19
COMPLAINT FOR DAMAGES

31, § 3730(h) and Government Code §12653(d) by her protests of fraudulent billing practices by defendants which included Medicare fraud.  In addition, defendants violated the public policies of this sate which prohibit employers from terminating employees who complain of illegal conduct by the employer or for their opposition to illegal practices.

63.    During the course of plaintiff's employment, Dr. Rhodes protested the decisions, policies, and practices of defendants, as set forth above, that resulted in inappropriate medical care to her patients and the patients of the Group of which she was a shareholder. Defendants constructively terminated, retaliated against and penalized Dr. Rhodes for advocating medically appropriate healthcare for patients in violation of the public policy of the State of California, which has resulted in damage and injury to plaintiff as alleged herein.

64.    As a proximate result of defendants' conduct, plaintiff has sustained and continues to sustain losses in earnings and other employment benefits.

65.    As a proximate result of defendants' conduct, plaintiff has suffered and continues to suffer humiliation, emotional distress, and mental and physical pain and anguish, and has incurred medical expenses, all to her damage in a sum according to proof.

66.    In doing the acts set forth above, defendants knew that the conduct that they would have required of plaintiff was unlawful, and required plaintiff to choose between violating the law and forcing her to resign. Notwithstanding this knowledge, defendant despicably subjected plaintiff to cruel and unjust hardship in conscious disregard of plaintiff's rights by insisting that plaintiff violate the law as set forth above. The oppressive conduct was committed by the managing agents of defendants, Dr. Mitnick, Dr. Stadelman and Ms. Edge. Further, defendants have ratified the conduct of

their employees set forth above by failing and refusing to discipline or reprimand them in any way.

67.   Defendants committed the acts alleged herein maliciously, fraudulently, and oppressively, with the wrongful intention of injuring plaintiff, and acted with an improper and evil motive amounting to malice and in conscious disregard of plaintiff's rights. Because the acts taken towards plaintiff were carried out by defendants acting in a despicable, deliberate, cold, callous, and intentional manner in order to injure and damage plaintiff, she is entitled to recover punitive damages in an amount according to proof.

## FOURTH CAUSE OF ACTION
### (Harassment in Violation of Govt. Code § 12940(a) and (j))

68.   The allegations set forth in Paragraphs 1 through 67 are re-alleged and incorporated herein by reference.

69.   At all times herein mentioned, Government Code §§ 12940(a) and (j) were in full force and effect and were binding upon defendants. These sections required defendants to refrain from harassing an employee on the basis of her gender. Dr. Rhodes was subjected to rude, aggressive, and threatening conduct that male radiologists were not subjected to. In addition, defendants enforced certain policies against female employees/partners but not males. Within the time provided by law, plaintiff filed a complaint with the California Department of Fair Employment and Housing in full compliance with Government Code § 12940 et seq., and received a right-to-sue letter.

70.   During the course of plaintiff's employment, defendants created and allowed to exist a hostile work environment and harassed plaintiff on the basis of plaintiff's gender. Such harassment was in violation of Government Code § 12940(a) and (j) and the public policy of the State of California, and has resulted in damage and

21
COMPLAINT FOR DAMAGES

injury to plaintiff as alleged herein.

71.    As a proximate result of defendants' conduct, plaintiff has suffered and continues to suffer humiliation, emotional distress, and mental and physical pain and has incurred medical expenses, all to her damage in a sum according to proof.

72.    Defendants committed the acts alleged herein maliciously, fraudulently, and oppressively, with the wrongful intention of injuring plaintiff, and acted with an improper and evil motive amounting to malice and in conscious disregard of plaintiff's rights. Because the acts taken towards plaintiff were carried out by defendants acting in a despicable, deliberate, cold, callous, and intentional manner in order to injure and damage plaintiff, she is entitled to recover punitive damages in an amount according to proof.

73.    Plaintiff has incurred and continues to incur legal expenses and attorneys fees. Plaintiff is presently unaware of the precise amount of said expenses and fees and prays leave of court to amend this complaint when said amounts are more fully known.

### FIFTH CAUSE OF ACTION
### (Sex Discrimination in Violation of Govt. Code § 12940(a))

74.    The allegations of paragraphs 1 through 73 are realleged and incorporated herein by reference.

75.    At all relevant times alleged in this complaint, California Government Code Section 12940(a) was in full force and effect, and was binding on defendants. This section prohibited defendants from discriminating against an employee, such as plaintiff, because of her sex. Plaintiff is female.

76.    Defendant violated Government Code Section 12940(a) in numerous respects, including but not necessarily limited to rude, aggressive, and threatening

COMPLAINT FOR DAMAGES

conduct that male radiologists were not subjected to. In addition, defendants enforced certain policies against female employees/partners but not males. For example, plaintiff is aware of at least one male radiologist who did not recommend pre-biopsy surgical consultations for several years and was never harassed about it. In contrast, plaintiff was regularly questioned and harassed about instances when she did not recommend similar consultations. Within the time provided by law, plaintiff filed a complaint with the California Department of Fair Employment and Housing in full compliance with Government Code § 12940 et seq., and received a right-to-sue letter.

77.     As a proximate result of defendant's willful, knowing and intentional conduct, plaintiff has sustained and continues to sustain losses in earnings and other employment benefits.

78.     As a further proximate result of defendant's conduct, plaintiff has suffered and continues to suffer humiliation, emotional distress, and mental anguish, all to her damage in a sum according to proof.

79.     Plaintiff has incurred and continues to incur legal expenses and attorneys fees. Plaintiff is presently unaware of the precise amount of said expenses and fees and prays leave of court to amend this complaint when said amounts are more fully known.

## SIXTH CAUSE OF ACTION
### (Retaliation in Violation of Govt. Code § 12940(h)

80.     The allegations of paragraphs 1 through 79 are realleged and incorporated herein by reference.

81.     At all times herein mentioned, California Government Code Section

§ 12940(h), was in full force and effect and was binding on defendants and prohibited defendants from retaliating against an individual, like plaintiff, who complains of harassment based on sex, and/or otherwise exercises her rights under the FEHA.

82.     Plaintiff is informed and believes and thereon alleges that defendants retaliated against her for her protests of what she reasonably believed to be harassment based on being a female and/or other activity on the part of plaintiff which is legally protected by the FEHA. Defendants retaliated against plaintiff in numerous respects, including but not necessarily limited to on or about May 27, 2011, after a period of wholly satisfactory, competent, and diligent performance, constructively discharged plaintiff for pretextual reasons. Within the time provided by law, plaintiff filed a complaint with the California Department of Fair Employment and Housing in full compliance with Government Code § 12940 et seq., and received a right-to-sue letter.

83.     As a proximate result of defendants' conduct, plaintiff has sustained and continues to sustain losses in earnings and other employment benefits.

84.     As a proximate result of defendants' conduct, plaintiff has suffered and continues to suffer humiliation, emotional distress, and mental anguish, all to her damage in a sum according to proof.

85.     Defendants committed the acts alleged herein maliciously, fraudulently, and oppressively, with the wrongful intention of injuring plaintiff, and acted with an improper and evil motive amounting to malice and in conscious disregard of plaintiff's rights. Because the acts taken toward plaintiff were carried out by defendants acting in a despicable, deliberate, cold, callous, and intentional manner in order to injure and

24
COMPLAINT FOR DAMAGES

damage plaintiff, she is entitled to recover punitive damages in an amount according to proof.

86.    Plaintiff has incurred and continues to incur legal expenses and attorneys fees. Plaintiff is presently unaware of the precise amount of said expenses and fees and prays leave of court to amend this complaint when said amounts are more fully known.

## SEVENTH CAUSE OF ACTION
### (Violation of Cal. Govt. Code § 12940(k) - Failure to Prevent Discrimination)

87.    The allegations of paragraphs 1 through 86 are realleged and incorporated herein by reference.

88.    At all times herein mentioned, Government Code § 12940(k) was in full force and effect and was binding on defendant. This section requires an employer to take all reasonable steps necessary to prevent harassment based on gendern and discrimination and retaliation from occurring. As alleged above, defendants violated this section by failing to take all reasonable steps necessary to prevent gender harassment and discrimination and retaliation from occurring. Within the time provided by law, plaintiff filed a complaint with the California Department of Fair Employment and Housing in full compliance with Government Code § 12940 et seq., and received a right-to-sue letter.

89.    As a proximate result of defendant's willful, knowing and intentional conduct, plaintiff has sustained and continues to sustain losses in earnings and other employment benefits.

90.    As a further proximate result of defendant's willful, knowing and

COMPLAINT FOR DAMAGES

intentional conduct, plaintiff has suffered and continues to suffer humiliation, emotional distress, and mental anguish, all to his damage in a sum according to proof. Plaintiff has sought treatment for the emotional distress and mental anguish she has suffered due to defendants' conduct and is entitled to special damages for the costs of such treatment.

91.   Plaintiff has incurred and continues to incur legal expenses and attorneys' fees. Plaintiff is presently unaware of the precise amount of such expenses and fees, and prays leave of court to amend this complaint when those amounts are more fully known.

92.   Defendant committed the acts alleged herein maliciously, fraudulently, and oppressively, with the wrongful intention of injuring plaintiff, and acted with an improper and evil motive amounting to malice and in conscious disregard of plaintiff's rights. Because the acts taken towards plaintiff were carried out by defendant acting in a despicable, deliberate, cold, callous, and intentional manner in order to injure and damage plaintiff, he is entitled to recover punitive damages in an amount according to proof.

## EIGHTH CAUSE OF ACTION
### (Defamation)

93.   The allegations of paragraphs 1 through 92 are re-alleged and incorporated herein by reference.

94.   As alleged above, defendants defamed plaintiff in a continuing series of defamatory statements beginning in mid-2010. Plaintiff is informed and believes that on numerous occasions the defamatory statements were republished, both orally and

COMPLAINT FOR DAMAGES

in writing, to persons who were both employed and not employed by defendants, resulting in further damage to plaintiff's reputation.

95.     These statements were false and defendants knew or should have known them to be false at the time they were made. Additionally and/or alternatively, defendants acted with reckless disregard for the truth at the time these statements were made. Defendants are vicariously responsible for the conduct of its managers which, as alleged above, was committed while acting on its behalf and within the scope of their duties as their employees, and which caused plaintiff's constructive termination.

96.     Shortly after plaintiff's constructive termination, defendants sent an e-mail to all radiologists instructing them that they were not allowed to provide a reference, either verbally or in writing, for any radiologist who left the Group and to refer all such requests to Dr. Mitnick. At the time the e-mail was sent, plaintiff was the only radiologist who had left the Group. Plaintiff is informed and believes that defendants' false statements about her have impeded her ability to obtain employment and have specifically prevented her from receiving positions with the following employers: (1) Kaiser Vallejo; (2) Kaiser Fremont/Hayward; and (3) Modesto Radiology.

97.     Defendants' conduct constituted libel and slander and violated California Civil Code sections 44, 45, and 46. Section 45 provides that "Libel is a false and unprivileged publication by writing, printing, picture, effigy, or other fixed representation to the eye, which exposes any person to hatred, contempt, ridicule, or obloquy, or which causes him to be shunned or avoided, or which has a tendency to injure him in

his occupation." Section 46 provides that "[s]lander is a false and unprivileged publication, orally uttered...which: (3) Tends directly to injure [plaintiff] in respect to [her] office, profession, trade or business...by imputing to [her] general disqualification in those respects which the office or other occupations peculiarly requires, or by imputing something with reference to [her] office, profession, trade, or business that has a natural tendency to lessen its profits."

98.    As a proximate result of defendants' conduct, plaintiff has sustained and continues to sustain losses in earnings and other employment benefits.

99.    As a proximate result of defendants' conduct, plaintiff has suffered and continues to suffer damages to her reputation, humiliation, emotional distress, and mental and physical pain and anguish, all to her damage in an amount according to proof. Plaintiff has sought treatment for the emotional distress and mental anguish she has suffered due to defendants' conduct and is entitled to special damages for the costs of such treatment.

100.    Defendants committed the acts alleged herein maliciously, fraudulently, and oppressively, with the wrongful intention of injuring plaintiff, and acted with an improper and evil motive amounting to malice and in conscious disregard of plaintiff's rights. Because the acts taken towards plaintiff were carried out by defendants acting in a despicable, deliberate, cold, callous, and intentional manner in order to injure and damage plaintiff, she is entitled to recover punitive damages in an amount according to proof.

//

COMPLAINT FOR DAMAGES

## NINTH CAUSE OF ACTION
### (Intentional Infliction of Emotional Distress)

101.    The allegations of paragraphs 1 through 100 are re-alleged and incorporated herein by reference.

102.    Defendants' actions towards plaintiff for reporting fraudulent practices and medically inappropriate health care included but was not limited to subjecting her to insults, rude treatment, unfair criticism, yelling and ultimately forcing her to quit. Defendants' actions constitute outrageous conduct against plaintiff.

103.    Defendants committed, or acted in concert to commit, acts which were intended to cause plaintiff to suffer emotional distress. In the alternative, defendants engaged in the conduct with reckless disregard of the probability of causing plaintiff to suffer emotional distress.

104.    Plaintiff suffered severe emotional distress as a result of defendants' outrageous conduct.

105.    As a proximate result of defendants' conduct, plaintiff has sustained and continues to sustain losses in earnings and other employment benefits.

106.    As a proximate result of defendants' conduct, plaintiff has suffered and continues to suffer humiliation, emotional distress, and mental and physical pain and anguish, all to her damage in a sum according to proof. Plaintiff has sought treatment for the emotional distress and mental anguish she has suffered due to defendants' conduct and is entitled to special damages for the costs of such treatment

107.    Defendants committed the acts alleged herein maliciously, fraudulently, and oppressively, with the wrongful intention of injuring plaintiff, and acted with an

29
COMPLAINT FOR DAMAGES

improper and evil motive amounting to malice and in conscious disregard of plaintiff's rights. Because the acts taken towards plaintiff were carried out by defendants acting in a despicable, deliberate, cold, callous, and intentional manner in order to injure and damage plaintiff, she is entitled to recover punitive damages in an amount according to proof.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for judgment against defendants as follows:

1.     For compensatory damages including lost wages and employee benefits; medical, psychological and other expenses; and other such damages according to proof on all causes of action;

2.     For general damages for emotional distress, humiliation, and mental anguish on all causes of action;

3.     For general damages for harm to reputation on the Sixth cause of action;

4.     For interest, including prejudgment interest at the legal rate;

5.     For costs of suit incurred herein;

6.     For attorneys' fees on the First, Second and Fourth through Seventh causes of action;

7.     For punitive damages on all causes of action; and

8.     For such other and further relief as this Court deems just and proper.

Dated: January 3, 2012          LAW OFFICES OF STEPHEN M. MURPHY

                                By:
                                        STEPHEN M. MURPHY

30
COMPLAINT FOR DAMAGES