1

2

3

4

5

6

7

8                       UNITED STATES DISTRICT COURT

9                       EASTERN DISTRICT OF CALIFORNIA

10

                              ----oo0oo----

11

12   BETH A. RHODES, M.D.,          NO. CIV. 2:12-0013 WBS DAD

13           Plaintiff,
                                    MEMORANDUM AND ORDER RE: MOTIONS
14        v.                        FOR SUMMARY JUDGMENT OR,
                                    ALTERNATIVELY, PARTIAL SUMMARY
15   SUTTER HEALTH, a California    JUDGMENT AND TO STRIKE
     Corporation, SUTTER GOULD
16   MEDICAL FOUNDATION, a California
     Corporation, THE GOULD MEDICAL
17   GROUP, INC., a California
     Corporation,
18
             Defendants.
19   _____/

20

21                            ----oo0oo----

22           Plaintiff Beth A. Rhodes brought this action against

23   Sutter Health, Sutter Gould Medical Foundation ("SGMF"), and The

24   Gould Medical Group, Inc. ("GMG") alleging unlawful retaliation,

25   constructive discharge, gender harassment, gender discrimination,

26   failure to prevent discrimination, violation of California

27   Business and Professions Code section 2056, defamation, and

28   intentional infliction of emotional distress.  Presently before

                                    1

1   the court is SGMF's motion for summary judgment or,

2   alternatively, partial summary judgment, as to plaintiff's fourth

3   through eleventh causes of action pursuant to Federal Rule of

4   Civil Procedure 56.  Also before the court is SGMF's motion to

5   strike pursuant to Federal Rule of Civil Procedure 37.

6   I.   Factual and Procedural Background

7        SGMF is a nonprofit corporation that operates

8   healthcare clinics and a clinical research department in

9   California's Central Valley.  (Sanders Decl. ¶¶ 2-3 (Docket No.

10  71).)  California prohibits the corporate practice of medicine,

11  which precludes SGMF from employing its own physicians to provide

12  medical services to its patients.[1]  (See Gordon Decl. Ex. B at 2

13  (Docket No. 73).)  Therefore, pursuant to the structure set forth

14  in California Health and Safety Code section 1206(1), SGMF

15  contracts with GMG, a medical group, for the services of its

16  physicians.  (Sanders Decl. ¶¶ 3-4, 13.)  Their relationship is

17  governed by the terms of their Professional Services Agreement

18  ("PSA"), which is usually renegotiated on an annual basis.  (Id.

19  ¶ 4.)

20       GMG enters into individual employment or independent

21  contractor agreements with each physician.  (Id. ¶ 5.)  Plaintiff

22

23  _____

        [1]   In California, "'[i]t is an established doctrine that a
24  corporation may not engage in the practice of such professions as
    law, medicine or dentistry.'"  Cal. Physicians' Serv. v. Aoki
25  Diabetes Research Inst., 163 Cal. App. 4th 1506, 1514 (1st Dist.
    2008) (quoting People ex rel. State Bd. of Med. Examiners v. Pac.
26  Health Corp., 12 Cal. 2d 156, 158 (1938)).  This "restriction on
    the corporate practice of medicine finds statutory expression in
27  California, where the practice of medicine without a license is
    prohibited and corporations have 'no professional rights,
28  privileges or power.'"  Id. (quoting Bus. & Prof. Code § 2400).

was employed by GMG as a radiologist specializing in breast and body imaging from January 2008 through May 2011.  (First Am. Compl. ("FAC") ¶ 14 (Docket No. 30); McClain Decl. in Supp. of Summ. J. Ex. C ("Rhodes Dep.") at 20:1, 40:4-7 (Docket No. 78-2).)  Plaintiff provided care to patients at SGMF's healthcare clinics in Modesto and Stockton.  (FAC ¶¶ 14-15.)

On April 30, 2010, plaintiff attended a meeting with Dr. Paul Stadelman ("Dr. Stadelman"), Chairman of the Radiology Department, Melinda Knox, another GMG doctor, and Robrta Edge ("Edge"), the SGMF Director of Imaging.  (Purtill Decl. Ex. B ("Rhodes Dep. II") at 189-90 (Docket No. 85:1-3), Ex. C ("Edge Dep.") at 201:22-202:21, 298:3-15 (Docket No. 86-1).)  At the meeting, plaintiff and Dr. Knox discussed plaintiff's concerns about Dr. Knox's performance, but there was tension between them. (See Rhodes Dep. II at 189-90.)  After the meeting, plaintiff received a letter from Dr. Stadelman stating that she had acted unprofessionally and that any further "unprofessional behavior" would "be grounds for [her] immediate termination."  (Purtill Decl. Ex. S; see also Rhodes Dep. II at 63:14-16.)

Following that meeting, several incidents involving plaintiff and SGMF staff occurred.[2]  First, a nurse eavesdropped on plaintiff and a patient and the nurse was reprimanded for that action.  (Edge Dep. 298:3-15; Ex. 53 to Edge Dep. at Sealed 28-30 (Docket No. 82).)  Second, another nurse, Kathy Davis ("Davis"),

_____

[2]     The court recounts these events in the light most favorable to plaintiff.  Orr v. Bank of Am., NT & SA, 285 F.3d 764, 772 (9th Cir. 2002).  SGMF vigorously contests plaintiff's version of these events and objects to the evidence used to support her contentions.  SGMF's evidentiary objections are addressed below.

1  harmed an eighty-five-year-old patient, Sara Grantski, by

2  disobeying plaintiff's standing order to hold pressure at

3  Grantski's breast biopsy site for fifteen minutes and thereby

4  causing her to develop a painful hematoma.  (Rhodes Decl. ¶¶ 2-

5  3.)  Davis also changed the pain score that Grantski had reported

6  from "zero" to "one."  (Id. ¶ 2.)

7         Third, a technician, Carolyn Plante, performed a

8  "Crown-Rump Length Measurement" incorrectly.  (Id. ¶ 6.)  When

9  plaintiff confronted her about it, Plante said, "'That's the way

10  we measure it here.  Why don't you ask a radiologist?'"  (Id.)

11  Plaintiff believes Plante and Davis did these things so that

12  plaintiff would have an inappropriate outburst in response and be

13  fired.  (Id. ¶¶ 2, 6.)  As a result of these incidents, plaintiff

14  felt anger, outrage, anxiety, and humiliation.  (Id. ¶¶ 2, 7.)

15  She internalized those feelings and believes that they were a

16  substantial factor in causing her to go on medical disability on

17  or about December 16, 2010.  (Id. ¶¶ 4, 8.)

18         Plaintiff brings claims against three defendants: GMG,

19  SGMF, and Sutter Health.  Plaintiff's FAC contains claims for (1)

20  retaliation in violation of the federal False Claims Act, (2)

21  retaliation in violation of the California False Claims Act, (3)

22  violation of California Business and Professions Code section

23  2056, (4) gender harassment in violation of the California Fair

24  Employment and Housing Act ("FEHA"), (5) sex discrimination in

25  violation of FEHA, (6) retaliation for reporting patient abuse in

26  violation of FEHA, (7) retaliation in violation of FEHA, (8)

27  failure to prevent discrimination in violation of FEHA, (9)

28  constructive discharge in violation of public policy, (10)

1  defamation, and (11) intentional infliction of emotional
2  distress.  (Docket No. 30.)

3        On May 22, 2012, the court dismissed all of plaintiff's
4  claims against Sutter Health and plaintiff's first through third
5  claims against SGMF.  (Docket No. 51.)  The parties then
6  stipulated to dismiss claim six with prejudice as to all
7  defendants.  (Docket No. 37.)  SGMF now moves for summary
8  judgment on claims four through eleven and contends that
9  plaintiff is not entitled to punitive damages.  (Docket No. 68.)
10  II.  <u>Request for Judicial Notice</u>

11        SGMF requests that the court take judicial notice of
12  the legislative history of Assembly Bill 2279, Chapter 133,
13  Statutes of 1980, which amended California Health and Safety Code
14  section 1206.  (Req. for Judicial Notice ("RJN") Ex. A (Docket
15  No. 79).)  Under Rule 201 of the Federal Rules of Evidence, the
16  court may take judicial notice of the legislative history of
17  state statutes.  <u>See</u> <u>Chaker v. Crogan</u>, 428 F.3d 1215, 1223 (9th
18  Cir. 2005) (taking judicial notice of legislative history of
19  California statute); <u>Louie v. McCormick & Schmick Rest. Corp.</u>,
20  460 F. Supp. 2d 1153, 1155 n.4 (C.D. Cal. 2006) (same).
21  Accordingly, the court takes judicial notice of the legislative
22  history of Assembly Bill 2279, Chapter 133, Statutes of 1980.
23  III. <u>Legal Standard</u>

24        Summary judgment is proper "if the movant shows that
25  there is no genuine dispute as to any material fact and the
26  movant is entitled to judgment as a matter of law."  Fed. R. Civ.
27
28

5

P. 56(a).[3]  A material fact is one that could affect the outcome
of the suit, and a genuine issue is one that could permit a
reasonable jury to enter a verdict in the non-moving party's
favor.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248
(1986).  The party moving for summary judgment bears the initial
burden of establishing the absence of a genuine issue of material
fact and can satisfy this burden by presenting evidence that
negates an essential element of the non-moving party's case.
Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).
Alternatively, the moving party can demonstrate that the
non-moving party cannot produce evidence to support an essential
element upon which it will bear the burden of proof at trial.
Id.

    Once the moving party meets its initial burden, the
burden shifts to the non-moving party to "designate 'specific
facts showing that there is a genuine issue for trial.'"  Id. at
324 (quoting then-Fed. R. Civ. P. 56(e)).  To carry this burden,
the non-moving party must "do more than simply show that there is
some metaphysical doubt as to the material facts."  Matsushita
Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).
"The mere existence of a scintilla of evidence . . . will be
insufficient; there must be evidence on which the jury could
reasonably find for the [non-moving party]."  Anderson, 477 U.S.
at 252.

    In deciding a summary judgment motion, the court must

---

        [3]   Federal Rule of Civil Procedure 56 was revised and
rearranged effective December 1, 2010.  However, as stated in the
Advisory Committee Notes to the 2010 Amendments to Rule 56,
"[t]he standard for granting summary judgment remains unchanged."

1 view the evidence in the light most favorable to the non-moving

2 party and draw all justifiable inferences in its favor.  Id. at

3 255.  "Credibility determinations, the weighing of the evidence,

4 and the drawing of legitimate inferences from the facts are jury

5 functions, not those of a judge . . . ruling on a motion for

6 summary judgment . . . ."  Id.

7 IV.  Claims Four Through Nine

8        SGMF requests summary judgment on five claims

9 (excluding claim 6, which has been dismissed) that require

10 plaintiff to demonstrate either an employment relationship or an

11 alternate basis for liability.  Claims four through eight are all

12 brought under FEHA, "which predicates potential . . . liability

13 on the status of the defendant as an 'employer.'"  Kelly v.

14 Methodist Hosp. of S. Cal., 22 Cal. 4th 1108, 1116 (2000)

15 (quoting Cal. Gov't Code § 12926).  Claim nine is a claim for

16 wrongful termination in violation of public policy, and "only an

17 employer can be liable for the tort of wrongful discharge."

18 Khajavi v. Feather River Anesthesia Med. Grp., 84 Cal. App. 4th

19 32, 38 (3d Dist. 2000).

20        Plaintiff alleges in her FAC and has repeatedly stated

21 under oath that only GMG was her employer.  (See, e.g., FAC § 14

22 (Docket No. 30); Rhodes Dep. at 19:24-20:4, 30:7-21, 31:1-11.)

23 She gave no indication that she intended to argue that SGMF is

24 her joint employer until her opposition to SGMF's motion for

25 summary judgment repeatedly used the term and referred to the

26 integrated enterprise test as one to determine joint employment.

27 The integrated enterprise test, however, determines whether two

28 separate corporate entities should be considered a single

7

1    employer.  At oral argument, plaintiff's counsel nevertheless

2    asserted that plaintiff is indeed arguing that SGMF was her joint

3    employer.  Accordingly, the court considers both whether SGMF was

4    plaintiff's joint employer and whether SGMF and GMG constitute

5    plaintiff's single employer under the integrated enterprise test.

6         A.   Joint Employer Test

7              In determining whether a defendant is a joint employer

8    under the FEHA, courts consider the totality of the circumstances

9    bearing on the nature of the work relationship of the parties,

10   with an emphasis on the extent to which the defendant controls

11   the plaintiff's performance of employment duties.  Hall v.

12   Apartment Inv. & Mgmt. Co., Civ. No. 08-03447, 2011 WL 940185, at

13   *5 (N.D. Cal. Feb. 18, 2011); Vernon v. State, 116 Cal. App. 4th

14   114, 124 (1st Dist. 2004).  Factors to be taken into account

15   include:

16             [P]ayment of salary or other employment benefits and
               Social Security taxes, the ownership of the equipment
17             necessary to performance of the job, the location where
               the work is performed, the obligation of the defendant to
18             train the employee, the authority of the defendant to
               hire, transfer, promote, discipline or discharge the
19             employee, the authority to establish work schedules and
               assignments, the defendant's discretion to determine the
20             amount of compensation earned by the employee, the skill
               required of the work performed and the extent to which it
21             is done under the direction of a supervisor, whether the
               at work is part of the defendant's regular business
22             operations, the skill required in the particular
               occupation, the duration of the relationship of the
23             parties, and the duration of the plaintiff's employment.

24   Vernon, 116 Cal. App. 4th at 125.

25             "'Of these factors, the extent of the defendant's right

26   to control the means and manner of the workers' performance is

27   the most important.'"  Vernon, 116 Cal. App. 4th at 126 (quoting

28   Lee v. Mobile Cnty. Comm'n, 954 F. Supp. 1540, 1546 (S.D. Ala.

                                   8

1995)).   "'A finding of the right to control employment requires
. . . a comprehensive and immediate level of "day-to-day"
authority over employment decisions.'"   <u>Doe I v. Wal-Mart Stores,</u>
<u>Inc.,</u> 572 F.3d 677, 682 (9th Cir. 2009) (quoting <u>Vernon</u>, 116 Cal.
App. 4th at 127-28).

     Here, it is undisputed that GMG paid plaintiff's
salary.  (<u>See</u> Pl.'s Stmt. of Genuine Issues & Disputed Facts at
14 (Docket No. 89); <u>see also</u> McClain Decl. in Supp. of Summ. J.
Exs. G at 216 (employment contract between GMG and plaintiff,
setting plaintiff's salary), K (payroll stub), O, P, Q, R (Docket
Nos. 78-4, 78-5).)   Although this factor is not dispositive, it
"is at least strong evidence that an employment relationship did
not exist."   <u>Vernon</u>, 116 Cal. App. 4th at 126.   Plaintiff does
not contend that SGMF "hired [plaintiff], set h[er] compensation,
or maintained any personnel records for [her]."[4]   <u>Id.</u> at 127.
Rather, it is undisputed that GMG determined the amount of
plaintiff's compensation, as well as the benefits she would
receive, and hired her.  (Pl.'s Stmt. of Genuine Issues &

---

[4]     In a letter to Medicare, SGMF represented that
plaintiff was its employee and that it would be billing for
plaintiff under its tax I.D. number.  (Purtill Decl. Ex. BB (Not
docketed).)   However, plaintiff does not dispute that GMG
determined which benefits plaintiff would receive.  (<u>See</u> Pl.'s
Stmt. of Genuine Issues & Disputed Facts at 15.)   That SGMF
facilitated plaintiff's enrollment in Medicare does not alter the
court's conclusion that SGMF was not plaintiff's joint employer.
      Plaintiff also states that SGMF represented that she
was an employee of SGMF to the Department of Health Care Services
and Memorial Hospital.  (<u>See</u> Purtill Decl. Exs. Z (Not docketed),
CC (Docket No. 88-1).)   The court has reviewed these documents,
however, and they do not identify plaintiff as an employee.
Likewise, Dr. Mitnik is not identified as the authorized agent of
SGMF for the "NDNP Query" for plaintiff, but rather is identified
as an "authorized submitter."   (<u>See</u> Ex. 157 to Mitnik Dep. at
Sealed 60-62 (Docket No. 82).)

1  Disputed Facts at 13-15.)

2         Except for the fact that SGMF owns the location where
3  plaintiff works, none of the other facts pointed to by plaintiff
4  provide indicia that SGMF exercised an "immediate level of 'day-
5  to-day' authority," Vernon, 116 Cal. App. 4th at 128, so as to
6  create an employment relationship between it and plaintiff.  It
7  is undisputed that Dr. Stadelman, a GMG employee, gave plaintiff
8  her work assignments.  (Pl.'s Stmt. of Genuine Issues & Disputed
9  Facts at 13-15.)  Moreover, as a physician, plaintiff practiced
10 under her own license and did not have a supervisor.  (Rhodes
11 Dep. 54:19-55:10.)  She also has the authority to make
12 independent, as well as final, decisions regarding patient care.
13 (Sanders Decl. ¶¶ 6,10,12; id. Ex. 2 Art. 1.1(a), 2.12, 9.1
14 (Docket No. 81).)  In contrast, GMG physicians may supervise SGMF
15 employees and require their removal from foundation sites.
16 (Purtill Decl. Ex. G at 238:20-239:9.)

17        SGMF also "had no apparent authority or discretion to
18 discipline, promote, transfer, or terminate" plaintiff.  Id.
19 The disciplinary warning plaintiff received was from Dr.
20 Stadelman.  (Rhodes Dep. 63:10-65:8.)  At most, one SGMF staff
21 member provided evaluations, at the request of GMG, of
22 plaintiff's performance on such issues as timeliness and her
23 demeanor with patients and staff.  (See Purtill Decl. Exs. M, O
24 (Docket Nos. 87-3, 87-4.)  Plaintiff points to the fact that Edge
25 reviewed documents relating to incidents between plaintiff and
26 other staff, but this was at the request of Dr. Steven Mitnik,
27 the Medical Director of GMG.  (Edge Dep. 291:15; Sanders Decl. ¶
28 6.)  She also suggests that Edge "was part of the 'leadership'

team responsible for the sham investigation to develop cause to

terminate plaintiff."  (Pl.'s Stmt. of Genuine Issues & Disputed

Facts at 5; see, e.g., Purtill Decl. Ex. R (records of interviews

with SGMF staff regarding GMG physicians) (Docket No. 87-4).)

Edge assisted with interviewing her staff to determine if they

had any problems with GMG doctors, however, because Dr. Mitnick

again requested that she do so.  (Edge Dep. 157:19-25.)

Plaintiff's harassment and gender discrimination complaints were

also conducted as a "joint investigation" by GMG and SGMF.

(Purtill Decl. Ex. F at 27:15-17, 108:22-23 (Docket No. 86-4).)

Evidence that an employer provided assistance with discrimination

complaints and even supported such departments as benefits,

diversity, and labor relations for another employer, however, is

insufficient to find that it exercised day-to-day control over

another employer's employment decisions in general or exercised

any control with respect to plaintiff.  Ruiz v. Sysco Corp., Civ.

No. 09-1824-H MDD, 2011 WL 3300098, at *4 (S.D. Cal. July 29,

2011) (applying integrated enterprise theory).

        The only other factor that might even suggest that SGMF

had control over the manner and means of plaintiff's performance

of her job is the SGMF-GMG joint operating policies.  Plaintiff

was especially concerned with SGMF's policy that patients be

scheduled for a surgical consult prior to any needle biopsy of

the breast.  (Purtill Decl. Ex. N (Docket No. 87-3).)  In the

case of that policy, however, it was developed by GMG doctors and

approved by Dr. Stadelman, the Chair of Imaging Services.

(McClain Decl. in Supp. of Reply Ex. F at 14:25-15:23, G at

237:13-239:8 (Docket No. 97).)  While the policy was in name

SGMF's, it was just as much GMG's policy.  The other policies

that plaintiff points to were also joint operating policies, such

as these for "Patients['] Rights and Responsibilities and Medical

Ethics" and "Zero Tolerance and the Prevention of Workplace

Violence."  (Purtill Decl. Exs. J,K.)  These joint policies do

not show that SGMF exerted control over GMG to require GMG

employees to follow its own policies, but rather that the two

entities, which work together to provide patient care, jointly

created policies that would apply to the employees of each.  Cf.

Hall, 2011 WL 940185, at *7 (inquiring whether plaintiff was

subject to alleged joint employer's independent personnel

policies).  Ultimately, SGMF did not assert "significant"

control over plaintiff such that would "'justify the belief on

the part of an aggrieved employee that the [alleged co-employer]

is jointly responsible for the acts of the immediate employer.'"

Hall, 2011 WL 940185, at *6 (quoting Vernon, 116 Cal. App. 4th at

126).[5]

      B.    Applicability of the Integrated Enterprise Test to
Claims Under the FEHA and Claims for Wrongful
Termination

          Under the integrated enterprise test, a parent and

---

[5]     The other facts offered by plaintiff to show that SGMF
was plaintiff's joint employer are not probative of whether SGMF
exercised substantial control over the manner and means of
plaintiff's performance of her job, including: (1) GMG members
sometimes identified themselves as SGMF employees and/or
identified plaintiff as an "SGMF/GMG" employee; (2) the Physician
Recruitment Director who recruited plaintiff held herself out as
an employee of SGMF/GMG; (3) plaintiff's treating orthopedist
identified her as a radiologist at SGMF/GMG; and (4) SGMF
letterhead was used by GMG doctors in communications with
plaintiff.

1    subsidiary may be considered a single employer.  Morgan v.
2    Safeway Stores, Inc., 884 F.2d 1211, 1213 (9th Cir. 1989).
3    When applying the test, courts consider four factors: (1)
4    interrelation of operations, (2) common management, (3)
5    centralized control of labor relations, and (4) common
6    ownership  or financial control.  Kang v. U. Lim Am., Inc.,
7    296 F.3d 810, 815 (9th Cir. 2002); Laird v. Capital
8    Cities/ABC, Inc., 68 Cal. App. 4th 727, 737 (5th Dist.
9    1998).  The test was originally developed by the National
10   Labor Relations Board ("NLRB") to determine whether it may
11   decide a particular labor dispute.  Nesbit v. Gears
12   Unlimited, Inc., 347 F.3d 72, 85 (3d Cir. 2003).  It is
13   useful for that purpose because, "[i]f the work forces of
14   two affiliated corporations are integrated, there is an
15   argument for a single bargaining unit covering both of them,
16   and also an argument that they should be combined for
17   purposes of determining whether the effect on commerce is
18   substantial enough to justify the Board in asserting
19   jurisdiction."  Papa v. Katy Indus., Inc., 166 F.3d 937, 942
20   (7th Cir. 1999).

21        Some federal courts have adopted the integrated
22   enterprise test to determine whether separate corporate entities
23   are a single employer for purposes of liability under statutes
24   prohibiting discrimination, including Title VII.  See, e.g.,
25   Sandoval v. Am. Bldg. Maint. Indus., Inc., 578 F.3d 787, 796 (8th
26   Cir. 2009) ("[T]he traditional four-factor standard is the means
27   by which plaintiffs demonstrate corporate dominance over a
28   subsidiary's operations and establish affiliate liability.");

                              13

1  <u>Cook v. Arrowsmith Shelburne, Inc.</u>, 69 F.3d 1235, 1241 (2d Cir.

2  1995) ("We believe that the appropriate test under Title VII for

3  determining when parent companies may be considered employers of

4  a subsidiary's employees is the four-part [NLRB] test adopted by

5  the Fifth, Sixth, and Eighth circuits.").  California courts have

6  applied the integrated enterprise test in FEHA and wrongful

7  termination cases for the same purpose.  <u>See, e.g.</u>, <u>Laird</u>, 68

8  Cal. App. 4th at 737-38 (applying test to claims arising under

9  FEHA and a claim for wrongful termination).

10           The Ninth Circuit, however, uses the test for a more

11  limited purpose.  Under its formulation, "[a] plaintiff with an

12  otherwise cognizable Title VII claim against an employer with

13  less than 15 employees may assert that the employer is so

14  interconnected with another employer that the two form an

15  integrated enterprise, and that collectively this enterprise

16  meets the 15-employee minimum standard [necessary to hold an

17  employer liable under Title VII]."  <u>Anderson v. Pac. Mar. Ass'n</u>,

18  336 F.3d 924, 929 (9th Cir. 2003).  In other words, "[t]he test

19  does not determine joint liability . . . , but instead determines

20  whether a defendant can meet the statutory criteria of an

21  'employer' for Title VII applicability."  <u>Id.</u> at 928.  If an

22  employer meets the statutory minimum independently, the test is

23  inapplicable.  <u>Id.</u> at 929.  Employed in this limited manner, the

24  integrated employer test advances the anti-discrimination purpose

25  behind Title VII by preventing employers from artificially

26  dividing themselves into organizations with fewer than fifteen

27  employees in order to escape liability.  <u>E.E.O.C. v. Falls Vill.</u>

28  <u>Ret. Cmty., Ltd.</u>, Civ. No. 5:05-1973, 2007 WL 756803, at *8 (N.D.

Ohio Mar. 7, 2007).

Other courts have recognized the limitations of the test for determining liability in the discrimination context.  In declining to apply the integrated enterprise to determine whether two entities should together be liable under Title VII, the Seventh Circuit explained that "[i]f the work forces of two affiliated corporations are integrated, . . . there is no argument for making one affiliate liable for the other's independent decision to discriminate." Papa, 166 F.3d at 942. "The basic principle of affiliate liability is that an affiliate forfeits its limited liability only if it acts to forfeit it--as by . . . configuring the corporate group to defeat statutory jurisdiction, or commanding the affiliate to violate the right of one of the affiliate's employees." Id. at 941.  "The claim that a group of affiliated corporations is 'integrated,' the sort of claim that the four-factor test might be thought to support, not only is vague, but is unrelated to the act requirement . . . or to the policy behind the exemption for employers that have very few employees." Id. at 942.

In Laird, the California Court of Appeal adopted the integrated enterprise test in a FEHA and wrongful termination case to determine whether a parent corporation could be liable for the acts of its subsidiary--the plaintiff's employer--as a single employer without discussion of statutory minimums or any act requirement. See Laird, 68 Cal. App. 4th at 737.  Instead, it simply noted that, "[b]ecause California's Fair Employment and Housing Act has the same nature and purpose as the federal law, California courts frequently look to federal case law for

15

1  guidance in interpreting the FEHA." Id.  The Laird court

2  articulated the test in a narrow fashion, framing it in terms of

3  whether a corporate parent could be held liable for the acts of

4  its subsidiary.  Courts applying California law have generally

5  followed suit, limiting the test's application to determining

6  whether corporations having a parent-subsidy relationship are

7  interrelated.[6]  See, e.g., Maddock v. KB Homes, Inc., 631 F.

8  Supp. 2d 1226, 1237-39 (C.D. Cal. 2007); Kang, 296 F.3d at 815-

9  16; Cellini v. Harcourt Brace & Co., 51 F. Supp. 2d 1028, 1034-35

10 (S.D. Cal. 1999); Hernandez v. AutoNation USA Corp., No. G030743,

11 2003 WL 22977576, at *8-9 (Cal. App. 4th Dist. Dec. 19, 2003);

12 Navarrete v. Telemundo Group, Inc., No. B142066, 2002 WL 1752821,

13 at *7-8 (Cal. App. 2d Dist. July 30, 2002).

14      Plaintiff does not contend that there is a parent-

15 subsidiary relationship between SGMF and GMG.  Instead, she asks

16 that the court extend application of the integrated enterprise

17 test to the relationship between SGMF and GMG, a nonprofit

18

19      [6]   Initially, the court notes that it may cite unpublished
   California appellate decisions as persuasive authority.  See

20 Employers Ins. of Wausau v. Granite State Ins. Co., 330 F.3d
   1214, 1220 n.8 (9th Cir. 2003).  The court found several such

21 unpublished cases that have not insisted on the parent-subsidiary
   relationship as a prerequisite for the test.  They are

22 distinguishable or unpersuasive, however.  In Nelson v. Fog City
   Diner, Inc., No. A095951, 2002 WL 31259512 (Cal. App. 1st Dist.

23 Oct. 9, 2002), the separate entities had common ownership.
   Nelson, 2002 WL 31259512, at *3; see id. at *11; see also

24 Goldstein v. Hanson, No. G033321, 2005 WL 775421, at *1, 3-4
   (Cal. App. 4th Dist. Apr. 5, 2005) (applying integrated

25 enterprise test to separate entities owned by the same person).
   In Martinucci v. S. Cal. Permanente Med. Grp., No. B215453, 2011

26 WL 1020043 (Cal. App. 2d Dist. Mar. 23, 2011), the court applied
   the test to determine whether the entity that contracted for

27 medical services from plaintiff's employer, a medical group, was
   a single employer.   Martinucci, 2011 WL 1020043, at *17-18.  The

28 court, however, applied the test without any analysis of its
   applicability beyond a parent-subsidiary relationship.  Id.

16

1  corporation and a medical group.  (See Sanders Decl. ¶¶ 2-5.)

2  SGMF's relationship with GMG is designed to comply with

3  California Health and Safety Code section 1206(1), which provides

4  multispeciality clinical groups (known as "foundations") an

5  exemption to licensing requirements.  (Id. ¶ 2; Gordon Decl. at

6  2-3.)  While the nonprofit may provide facilities or technical

7  components of care, such as non-physician staff and equipment,

8  under section 1206(1), it must form an arm's length relationship

9  with physicians solely responsible for medical care because

10 California prohibits the corporate practice of medicine.[7]

11 (Gordon Decl. at 2-3.)  To comply with section 1206(1), GMG's

12 doctors provide medical services to SGMF pursuant to the PSA

13 contract, (Sanders Decl. ¶¶ 4-5), which may be terminated by

14 either party with or without cause, (id. ¶ 10).  Plaintiff does

15 not dispute that the relationship between SMGH and GMG is

16 dictated by California law governing the practice of medicine and

17 that their relationship is distinct from a parent-subsidiary

18 relationship.  (See Pl.'s Stmt. of Genuine Issues & Disputed

19

20         [7]   Plaintiff notes in the "Introduction" to her opposition
   "that she has raised a genuine issue of fact with regard to
21 whether or not SGMF violated the [section 1206(1)] exemption
   [SGMF] base[s] [its] argument on (i.e., need a foundation because
22 they cannot practice medicine)" because a policy she contested
   was a SGMF policy and because SGMF shredded the personal medical
23 records of patients to prevent the fraud behind that policy from
   being revealed.  (Opp'n at 1:13-25 (Docket No. 90).)  The court
24 addressed the SGMF policy as it relates to whether SGMF was
   plaintiff's joint employer above.  Moreover, whether or not these
25 assertions are well-founded or show that SGMF and GMG violated
   section 1206(1), SMGF and GMG's compliance with the statute does
26 not bear on whether the court should extend the integrated
   enterprise test to entities operating under section 1206(1).  The
27 court construes this argument as plaintiff's identification of
   additional facts to suggest that because SGMF was engaging in
28 actions that touch on the practice of medicine by GMG, the
   entities are interrelated under the integrated enterprise test.

Facts at 10-11.)

Plaintiff provides no rationale for extending the integrated enterprise test from affiliated corporations to two separate corporate entities that have merely a contractual relationship.  The court believes it would be an untenable notion for a corporate entity to face potential liability for another entity's discriminatory acts simply because the one contracted to provide services to the other.  It would also be difficult to know where to draw the line amidst contractual relationships once this court extended the test beyond the parent-subsidiary relationship.  As the court in Miller v. Swiss Re Underwriters Agency, Inc., Civ. No. 09-09551, 2010 WL 935697 (C.D. Cal. Mar. 15, 2010), noted when considering plaintiff's request to apply the integrated enterprise test to a corporation that she alleged shared a common parent and management structure, use of the test for that broader purpose was "misplaced."  See Miller, 2010 WL 935697 at *2-3 (applying the test anyway and noting that it "hinges on whether one entity exercises an unusual degree of control over another legally separate, but related entity").

As explained above, the foundation model is intended to create an arm's length relationship between the nonprofit clinic and medical group practice because corporations cannot practice medicine.  (Gordon Decl. at 3.)  The policy behind imposing liability under the integrated enterprise test is the "'fairness of imposing liability for labor infractions where two nominally independent entities do not act under an arm's length relationship.'"  Bowoto v. Chevron Texaco Corp., 312 F. Supp. 2d 1229, 1237-38 (N.D. Cal. 2004) (quoting Murray v. Miner, 74 F.3d

402, 405 (2d. Cir. 1996)).  Plaintiff does not dispute that the relationship between the parties is organized under that law, nor does she explain why the other tests used by California courts to determine liability under FEHA are insufficient to capture a situation in which the nonprofit group does not in fact have an arm's length relationship with a physicians' group and is actually operating as an employer of a physician.  See Bishop v. Wyndham Worldwide Corp., Nos. A122517, A123449, 2011 WL 576571, at *33-34 (Cal. App. 1st Dist. Feb. 18, 2011) (alter ego, agency, equitable estoppel, "totality of the working relationship," and joint employer tests used in FEHA cases to determine an employer).

For this same reason, the court declines plaintiff's invitation to adopt a new test--what she fashions the "integral enterprise test"--to apply in the specific context of the foundation model.  Plaintiff argues that SGMF and GMG not only operate jointly, but are dependent on each other to deliver health care.  (Opp'n at 8.)  She also notes the legislative history of California Health and Safety Code section 1206(1) explains that foundations operating under the aegis of that statute "should be treated like physicians' offices" and "function like group practices of physicians."  (RJN at 7, 14; see Opp'n at 11.)  That two entities interact to meet a common end--in this case the provision of healthcare--is not sufficient within itself to hold both liable for each's discriminatory acts when their relationship is merely contractual.  Moreover, here there is no question that each employer, SGMF and GMG, is obligated to comply with FEHA for its own employees, as would a

physician's office for its employees.  Thus, there is no "back
door to exempt the [foundations] from their [FEHA] obligations
for violations of discrimination laws." (Opp'n at 8:24-25.)  If
an employee working for a foundation operating under section
1206(l) and facing adverse employment action believes he or she
is jointly employed or another employer may be liable for adverse
actions against her under a different theory, she may argue as
much.  Plaintiff did so here and, in addition, she has sought
relief against SGMF employees that she believes contributed to
her harm under state tort law.

Plaintiff's request also brings to the fore a
fundamental tension in her position.  As discussed above,
California prohibits corporations from employing physicians to
provide medical services.  This ban extends even to nonprofit
corporations because the danger of lay control attends all types
of corporations.  See Cal. Physicians' Serv. v. Aoki Diabetes
Research Inst., 163 Cal. App. 4th 1506, 1516 (1st Dist. 2008)
(noting that the ban protects patients).  "The restriction is
meant 'to protect the professional independence of physicians and
to avoid the divided loyalty inherent in the relationship of a
physician employee to a lay employer.'" Id. at 1514 (quoting Cal.
Med. Ass'n, Inc. v. Regents of Univ. of Cal., 79 Cal. App. 4th
542, 550 (2d. Dist. 2000)).  By arguing that SGMF is her
employer--under either the joint employer, integrated enterprise,
or "integral enterprise" tests--plaintiff wants the benefit of
potentially holding SGMF liable for her claims.  But plaintiff
cannot adopt this position without also suggesting that she was
complicit in relinquishing her professional independence to lay

1   control and compromising her loyalty to her patients.  See Cal.

2   Bus. & Prof. Code § 2264 (prohibiting "[t]he employing, directly

3   or indirectly, the aiding, or the abetting of any unlicensed

4   person . . . to engage in the practice of medicine or any other

5   mode of treating the sick or afflicted which requires a license

6   to practice constitutes unprofessional conduct").  This court has

7   not been presented with a compelling reason to let plaintiff

8   receive the benefits of an employment relationship without

9   accepting the consequences such employment entails.  Furthermore,

10  doing so would chip away at a legislatively built wall intended

11  to allow nonprofit corporations to work with medical groups to

12  deliver healthcare without relinquishing physician control to

13  those corporations.

14          Moreover, as discussed above, the grounds for applying

15  the integrated enterprise test to determine liability under

16  employment discrimination statutes are infirm in the first place.

17  The test was not created to determine whether an entity had

18  control over a particular employee or directed any

19  discrimination.  There is also no indication that the reason the

20  test was imported from Title VII into FEHA case law was to enable

21  plaintiffs to meet the statutory minimums of FEHA.  The Laird

22  court adopted it explicitly to determine liability rather than

23  coverage.  See 68 Cal. App. 4th at 737-41.  FEHA's statutory

24  minimum is a mere five employees; this significantly lessens the

25  concern that firms can organize themselves to avoid liability.

26  See Cal. Gov't Code § 12926(d).  There are no allegations here

27  that SGMF and GMG are organized under section 1206(1) for such a

28  purpose.

1    Finally, also cutting against extension of the test, is

2  the presumption that separate corporate entities have distinct

3  identities.  Laird, 68 Cal. App. 4th at 737.  As the Laird court

4  noted in regard to a parent and subsidiary, plaintiffs bear a

5  heavy burden under both California and federal law when they seek

6  to rebut this presumption and hold multiple corporate entities

7  liable as a single employer.  Id.  A fortiori, corporate entities

8  that are unaffiliated and connected only through contract should

9  not be joined as a single employer without a persuasive reason

10  for doing so.  This court discerns none.  Without direction from

11  California courts, the court is not inclined to extend the test

12  outside of the parent-subsidiary relationship and does not do so.

13  Accordingly, the court must grant SGMF's motion for summary

14  judgment as to plaintiff's fourth through ninth claims (excluding

15  claim six) for FEHA violations and wrongful termination.

16  V.   Claim Ten for Defamation

17    Plaintiff concedes that her claim for defamation should

18  be dismissed with respect to SGMF.  (Opp'n at 3:9-10.)

19  Accordingly, the court will dismiss plaintiff's claim for

20  defamation with prejudice as to SGMF.

21  VI.  Motion to Strike

22    In support of her opposition to SGMF's motion for

23  summary judgment, plaintiff submitted a declaration from Carol

24  Frazier ("Frazier").  (Docket No. 93.)  Plaintiff failed,

25  however, to identify Frazier as a witness in her initial

26  disclosures under Federal Rule of Civil Procedure 26.  (Mot. to

27  Strike at 2:4-5 (Docket No. 101).)  SGMF moves to strike

28  Frazier's declaration on this ground.

1     Rule 26(a) requires parties to disclose the names and
2   contact information of individuals "likely to have discoverable
3   information" that the disclosing party may use to support its
4   claims or defenses, as well as the subject of the information
5   known by the individuals. Fed. R. Civ. P. 26(a). Rule 37 gives
6   teeth to that requirement, providing in relevant part that "[i]f
7   a party fails to provide information or identify a witness as
8   required by Rule 26(a) or (e), the party is not allowed to use
9   that information or witness to supply evidence on a motion, at a
10   hearing, or at a trial, unless the failure was substantially
11   justified or is harmless." Fed. R. Civ. P. 37(c)(1). "The party
12   facing sanctions bears the burden of proving that its failure to
13   disclose the required information was substantially justified or
14   is harmless." R & R Sails, Inc. v. Ins. Co. of Penn., 673 F.3d
15   1240, 1246 (9th Cir. 2012).

16     Although Frazier's name appears to have come up only
17   once in the documents produced by plaintiff (albeit her maiden
18   name), (Mot. to Strike at 4:5-6), she was repeatedly mentioned in
19   the various depositions of other witnesses when discussing
20   plaintiff's contention that a nurse had intentionally harmed
21   Frazier's mother. For example, plaintiff stated during her
22   deposition that she "spoke with the patient and her daughter and
23   they signed something saying that what Ms. Davis had put was
24   incorrect." (Purtill Decl. in Opp'n to Mot. to Strike Ex. A at
25   150:3-5; see id. at 135:20-136:8, Ex. C at 328:1-25, Ex. D at
26   232:4-233:17 (Docket No. 102-1).) Plaintiff also referred to the
27   incident involving Frazier's mother in her FAC as a basis of her
28   defamation and intentional infliction of emotional distress

1  claims.  (See FAC ¶¶ 144, 156).

2         Plaintiff represents that her failure to disclose
3  Frazier as a potential witness was an honest mistake.  (Purtill
4  Decl. in Opp'n to Mot. to Strike ¶ 8 (Docket No. 102-1).)  The
5  court has no reason to doubt that representation.  Nevertheless,
6  the court cannot find that her failure to do so was harmless.
7  Parties, aware of the "self-executing" and "automatic" nature of
8  Rule 37(c)(1) sanctions, have a right to expect that only
9  disclosed witnesses will be used to support the disclosing
10 party's claims and defenses.  Yeti by Molly, Ltd. v. Deckers
11 Outdoor Corp., 259 F.3d 1101, 1106 (9th Cir. 2001) (citing Fed.
12 R. Civ. P. 37 advisory committee's note (1993)).  They should be
13 able to rely on Rule 26 disclosures and not be required to second
14 guess whether a disclosing party has purposefully omitted a
15 potential witness or done so accidently.  Thus, even though
16 Frazier had been referenced in the depositions of other
17 witnesses, SGMF was not on sufficient notice that she possessed
18 information that supported plaintiff's claims or defenses such
19 that it could make an informed decision about whether to pursue
20 discovery as to Frazier.

21        The district court has wide discretion to issue
22 sanctions under Rule 37(c)(1).  Yeti by Molly, Ltd., 259 F.3d at
23 1106; Fed. R. Civ. P. 37(c)(1)(C) (providing that, in addition to
24 or instead of excluding a witness, the court "may impose other
25 appropriate sanctions").  It is this court's practice not to
26 decide motions on procedural technicalities when defects can be
27 remedied by other, less drastic sanctions, such as permitting the
28 opposing party to depose the previously undisclosed witness.  The

1  court will therefore deny SGMF's motion to strike on the

2  condition that SGMF have an opportunity to depose Frazier, if it

3  chooses to do so, at plaintiff's expense.

4        Because Frazier's declaration bears only on SGMF's

5  motion for summary judgment with respect to plaintiff's claims

6  for intentional infliction of emotional distress and punitive

7  damages,[8] it will be a sufficient remedy if SGMF is allowed to

8  file an amended reply to plaintiff's opposition to its motion for

9  summary judgment with respect to those two claims after being

10 afforded the opportunity to take Frazier's deposition.  The court

11 will accordingly withhold ruling on those claims until SGMF has

12 had the opportunity to exercise that option.

13       IT IS THEREFORE ORDERED that defendant SGMF's motion

14 for summary judgment be, and the same hereby is, GRANTED as to

15 claims four, five, seven, eight, and nine;

16       IT IS FURTHER ORDERED that plaintiff's tenth claim for

17 defamation be, and the same hereby is, DISMISSED with prejudice

18 as to SGMF;

19       AND IT IS FURTHER ORDERED that SGMF's motion to strike

20 the declaration of Carol Frazier be, and the same hereby is,

21 DENIED, on the condition that within twenty days of this Order,

22

23       [8]  "In California there is no separate cause of action for
   punitive damages."  McLaughlin v. Nat'l Union Fire Ins. Co., 23
24 Cal. App. 4th 1132, 1164 (1994).  To obtain punitive damages, a
   plaintiff must first prove that there was a tortious act that
25 gave rise to actual, presumed, or nominal damages.  Id.  Because
   plaintiff's claim for punitive damages will depend upon whether
26 she may proceed with her intentional infliction of emotional
   distress claim, the court will decide the motion for summary
27 judgment on plaintiff's punitive damages claim along with the
   motion on her intentional infliction of emotional distress claim.
28

plaintiff shall make available witness Frazier and bear the costs
for SGMF to depose her and receive transcripts of the deposition.
Within fourteen days after completion of the deposition, SGMF may
file an amended reply to plaintiff's opposition to SGMF's motion
for summary judgment with respect to plaintiff's claims for
intentional infliction of emotional distress and punitive
damages.  If SGMF elects not to depose Frazier, it shall so
inform the court within twenty days of this Order, and the court
will decide plaintiff's intentional infliction of emotional
distress and punitive damages claims on the present record.

DATED:  February 1, 2013

WILLIAM B. SHUBB
UNITED STATES DISTRICT JUDGE